No. 33,355

·Howard C. Baker, *Appellee,* v. The Kansas Power and Light Company, *Appellant.*

(69 P. 2d 731)

Opinion filed July 10, 1937.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove, Robert E. Russell,* all of Topeka, *Hal E. Harlan* and *A. M. Johnston,* both of Manhattan, for the appellant.

*Fred R. Smith, Gerald F. Smith,* both of Manhattan, *Raymond E. Smith,* of Marysville, *E. R. Sloan, W. Glenn Hamilton, F. A. Sloan* and *Eldon R. Sloan,* all of Topeka, for the appellee.

The opinion of the court was delivered by

Hutchison, J.: This was an action in tort against the Kansas Power and Light Company, a corporation supplying the citizens and the public in Manhattan with natural gas. It was brought by one who was injured in an explosion of natural gas in his garage on August 20, 1935, as he attempted to drive his automobile out of the garage as usual at eight o'clock in the morning. The explosion came from gas from a pipe running under the garage which had been placed there in 1920.

There were three lots facing the south on Vattier street. The plaintiff occupied the middle one of these three lots as a tenant and had occupied the same from December 14, 1934, and had kept

his automobile in the garage during that time, using it every day. There was no gas connection with the garage. The house in which he lived was connected with gas but not with the line which went under the garage. The house connection ran to the alley at the north of the lot and connected with the main line of the defendant company running east and west through the alley. The line that went under the garage also connected with the line in the alley and a short distance below the garage turned to the east and entered and supplied the house on the lot to the east of the one where plaintiff resided. There was also a branch connection or line that ran to the west and at one time connected with the house on the west, but it was disconnected before this accident and plugged at the outer end.

The plaintiff did not know that any line ran under the garage and neither did the defendant company know of it, said company being a successor of former companies which distributed artificial gas and later natural gas. The line was put in at the request of the owner of the lot on the east in 1920, and at that time there were no buildings on this center lot, and it was stipulated in the trial that this service line under the garage was not the property of the defendant. It was located about a foot and a half or two feet west of the east line of the center lot and about one and one half feet under the garage along the east side thereof.

A tenant by the name of Christie and family occupied these premises, that is, the middle lot, just prior to the time they were occupied by the plaintiff, and on or about September 5 or 6, 1934, they notified the gas company of a peculiar odor in and about the garage. The defendant gas company sent one of its representatives on September 6, 1934, to make an examination in regard thereto. He did so and reported to Mrs. Christie and handed her a statement in writing as follows: "Checked for leak at garage but none—no pipe close by garage. No pipe within twenty foot of garage," and asked her to call him if they noticed anything more. The plaintiff and his family had not used natural gas before moving into this property and were not familiar with its odor.

The plaintiff in his petition charged the defendant with negligence along several different lines which he alleged led to the explosion and to his severe injury, especially to his face and hands, and asked to recover several items of damage sustained by reason of the explosion. The defendant, after making some preliminary motions, filed

an answer in the form of a general denial, and especially alleged that the plaintiff had sole control over the premises on which the garage was located and knew, or should have known, the condition of the garage and any gas pipes located on the premises, that, being a healthy man, he should have detected the escaping gas and used his sense of smell and known that it was dangerous to start an automobile under such circumstances if gas was escaping and that he was therefore guilty of such contributory negligence as would bar his recovery. To this answer a reply in the form of a general denial was filed by plaintiff.

The matter came on for trial on September 14, 1936. A demurrer of defendant to the plaintiff's testimony was overruled, and the defendant introduced its evidence, and after instructions by the court the jury rendered a verdict in favor of the plaintiff in the sum of $11,993.60, and in connection therewith made the following answers to the special questions submitted by the court:

"1. Was the inspection made by defendant pursuant to the complaint received from Christies made according to approved practices in the gas industry? A. No.

"2. Did the defendant company, as a result of such inspection, find any escaping gas on the premises at 1226 Vattier? A. No.

"3. Did gas escape at any time prior to August 19, 1935, into the garage in question and while the plaintiff resided at 1226 Vattier street, in such quantities as to be noticeable or detectable by the sense of smell? A. Yes. But plaintiff did not recognize or detect odor.

"4. If you find for plaintiff, then state the amount of damages which you allow for: (a) Doctors' bills; (b) hospital bills; (c) damage to automobile; (d) damage to clothing; (e) loss of time from employment; (f) permanent injuries; and (g) pain and suffering. A. (a) $132; (b) $226.60; (c) $150; (d) $35; (e) $450; (f) $9,000; (g) $2,000.

"5. If you find that the defendant was guilty of negligence which was the proximate cause of the explosion, then state the act or acts of negligence of which you find defendant guilty. A. Guilty of negligence; 1st, in not making regular inspections as provided by ordinance; 2d, in not making proper and thorough investigation at time notice of leak was given, when investigation was made by Mr. Roberts on September 6, 1934.

"6. If you find that there was a break in the gas line under the garage from which gas escaped in sufficient quantities to cause the explosion in question, then state: (a) When such break in the gas line occurred. A. Some time prior to September 6, 1934. (b) What caused said gas line to break? A. Deterioration of pipe and some unknown force of nature. (c) Whether the defendant company had any knowledge or notice prior to the time of the explosion that there was a break or defect in said gas line. A. Company had notice of gas leak at time Mr. Christie notified them of odor of gas. (d) Who, if any

one, notified the defendant company that there was a break or defect in said gas line? A. Mr. Christie."

After the overruling of motions for judgment on the special findings notwithstanding the verdict and for a new trial, judgment was rendered for the plaintiff on the verdict, from which judgment the defendant appeals.

The defendant outlines four special questions involved in the appeal:

1. Where natural gas is delivered to a consumer through service pipes installed at the expense of and owned by the consumer, is the gas company required to make frequent examinations of such service pipes for the purpose of detecting defects in them?

2. If the occupant of the premises in the fall of 1934 noticed a peculiar odor on the premises and reported the same to the company, and upon investigation the company failed to discover evidence of leaking gas and directed the occupant to notify the company if the odor should be noticed again and no such notice was given, can the company be negligent and liable for such explosion on August 20, 1935?

3. If the occupant of the premises from December 14, 1934, to August 20, 1935, used natural gas in the house and daily used the garage on the premises and did not notice any peculiar odor in or about the garage and an explosion of gas from the service pipes under the garage occurred in August, 1935, is the gas company guilty of negligence?

4. Is the award of the jury to the plaintiff of $9,000 for permanent injuries justified under the evidence, and is it not excessive?

Under these questions involved the defendant insists that there was not sufficient or competent evidence for the answers given by the jury to several of the questions submitted. Defendant also seriously objects to instructions Nos. 6 and 7 given by the trial court and its failure and refusal to give instructions Nos. 1 and 2 requested by the defendant.

It is urged by appellant that the negative answer to question one as to the inspection which was made on complaint received from the Christies not being made according to approved practices in the gas industry, was contradicted by evidence of witnesses Alden and Roberts, who told of the approved and accepted plan for locating leaks of escaping gas. It is true they did describe the approved practice, and the witness Roberts testified in addition that he used that

practice by driving a bar down in the ground about eighteen or twenty inches below the surface and testing with a flame either by match or torch, but there was a conflict of testimony as to what Mr. Roberts actually did when making the investigation. Mrs. Christie testified that he did not use a rod to poke holes in the ground, that she didn't see him have a blow torch and that she was there as long as he was. The jury could very properly answer the question as it did by giving more credit to the testimony of one witness than the other.

The answer to question three is said to be unsupported by any evidence. It concerned gas escaping into the garage prior to August 19, 1935, in such quantities as to be noticeable or detectable by the sense of smell, and the answer was, "Yes. But plaintiff did not recognize or detect odor." Both Mr. and Mrs. Christie and Miss Johnson, who lived with them, noticed and detected the odor in and about the garage, and Mr. Christie said he didn't think it was gas after the investigation was made and didn't know whether it was gas or not. Witness H. O. Brown testified he was at the garage in June, 1935, and noticed the odor of gas around the building.

In the answer to question five the jury named two of the several claims of negligence set out in the petition, and that eliminates all the others. The first is in not making regular inspections as provided by ordinance. It is pointed out correctly that the ordinance did not provide for inspections; therefore, that part referring to ordinance is inapplicable. Counsel for appellant are frank and generous enough to suggest that the jury had in mind or meant "provided by law." To the extent of the use of the word "ordinance" the answer is not supported by the evidence, but without that word it finds the defendant guilty of negligence in not making regular inspections. The second ground of negligence found by the jury in answer to question five was "in not making proper and thorough investigation at time notice of leak was given, when investigation was made by Mr. Roberts on September 6, 1934." In this connection appellant again refers to the kind of inspection made on September 6 according to the testimony of Mr. Roberts, which the jury evidently did not fully credit, and also to the word "leak" in the answer, that no notice of any leak was ever given, and from December, 1934, until August 20, 1935, no one noticed even a peculiar odor. We must again refer to the testimony of the two Christies and Miss Johnson and also to the direct testimony of Mr. Brown

as to odor of gas, and in this same connection we may make reference to the testimony of Mr. Roberts where he said that when he went to the place he asked Mrs. Christie if she had made a complaint about gas leaking in her yard, and he further testified that he proceeded to make a test for leaking gas. We think there is ample testimony to sustain this finding.

As to question six where reference is made to the break in the gas line, the answer was that it occurred some time prior to September 6, 1934. Serious criticism is made of the use of the word "break" both in the question and in the answer. There was some testimony offered to the effect that the pipe when removed from the ground showed a break, while other testimony showed a rusting of the pipe which caused the leak. It would be exceedingly technical to discriminate as to the use of this word "break" under the testimony. The answer to subdivision (b) of question six also concerned breaking, and the cause of it was deterioration of the pipe and some unknown force of nature. This is criticized as being more of a conclusion than a finding, but that will not be a ground for disregarding it at this time. The answer to subdivision (c) of question six that the company had notice of gas leak at the time Mr. Christie notified it of odor of gas is again criticized, but the statements we have heretofore made with reference to leak and odor will apply here and the same can be said in answer to subdivision (d) that Mr. Christie was the one who notified the company of the gas leak. We think there was sufficient evidence to support the answers of the jury to all these questions that have been called in question in this connection.

The argument of appellant as to the giving of instructions Nos. 6 and 7 and refusing to give instructions Nos. 1 and 2 requested has reference mainly to the fact that the gas line under the garage did not belong to the company and the court imposed a duty on the company for the care of the same. If the defendant company has no duty or obligation whatever concerning such a service line, whether it belongs to plaintiff or not, then the instructions given are wrong. Instructions 6 and 7 must be read in connection with the other instructions given, and these two and the others given in substance include the main features contained in the two requested. Both those instructions given and those requested include the giving of the notice of defects although the argument of appellant is generally against the effectiveness of the notice given by the Christies.

There are three classes of decisions cited and discussed in the briefs in this case. A number of Kansas cases are cited where the only pipe lines under consideration are those of the company, and the opinions refer to its pipe lines or the lines of the company. There is and ought to be a distinction as to immediate responsibility as to them. But our decisions have gone further by extending liability for proper care and inspection as to service lines under certain circumstances. It was held in *Atkinson v. Wichita Gas Co.*, 136 Kan. 854, 18 P. 2d 127, that—

"The liability extends to leaks or defects in the service pipes of the system owned by the owner of the house, as well as in those owned by the gas company, where it assumes and undertakes to inspect and repair all the pipes." (Syl. ¶ 2.)

It was said in the opinion:

"The leak of the gas which caused the explosion appears to have been from the service pipe leading from the curb of the street up to the house, and defendant calls attention to the fact that the owner of the house and not the defendant owned the service pipe, and the claim is that it was not the duty of the gas company to maintain the pipe and it should not be held responsible for defects in it. As we have seen, notice was given to the gas company that gas was escaping on the premises, and the employee of the company in charge was asked by the owner if he should get a plumber to make the test or if it was the duty of the gas company to attend to the matter. The reply was that the company would take care of it, and that appears to be the practice of the company—to inspect and make tests of the service pipes regardless of ownership. It appears that the gas company agreed to make the inspection and remedy any defects found. It not only undertook the task, but it made a test of some kind and found a slight defect in the meter, which it repaired. It failed, however, to discover the leak which impregnated the house and premises about it. A second notice that the gas odor prevailed about the premises brought the reply that the matter had been taken care of; and although the real defect was not found prior to the explosion there appears to have been no difficulty in finding it after the explosion, and it is plain that if reasonable care had been exercised when notice was given, the defect would have been disclosed and the explosion avoided. The handling of gas required prompt action on the part of the gas company, and it devolved upon that company to exercise reasonable care to discover the source of the leak as soon as it received notice that gas was escaping, whether the leak was in the main or service pipes." (p. 857.)

This case was referred to and approved in the case of *Miller v. Wichita Gas Co.*, 139 Kan. 729, 33 P. 2d 130, where it was held:

"Where a gas-distributing company has notice that gas appliances are throwing off fumes, and the circumstances are such that the employees of the company should have known that the fumes thrown off were carbon monoxide

fumes, and the gas company undertakes to make an inspection of the equipment and appliances, it is bound to make this inspection with such thoroughness as would enable it to discover what is causing the fumes and to shut off the gas until the dangerous condition is remedied." (Syl.)

In the case just cited the appliances in use were neither sold nor installed by the defendant company.

In the recent case of *Snook v. City of Winfield,* 144 Kan. 375, 61 P. 2d 101, which applied to the liability of a city in furnishing electricity to the citizens and some people in the country, the city agreed with farmers that they might build or pay for building a line from their homes to the high line for the transportation of electricity and the wiring of their premises, and after inspecting these the city agreed to furnish electricity and undertook to keep the line and transformer in repair so as to furnish good service, it was held—

"The fact that the farmers paid for the line and transformer in the first instance did not relieve the city from liability for damages from electricity caused by a defective transformer or distribution lines." (Syl. ¶ 3.)

It was also held in that case that—

"One who sells electricity to be used on lines or appliances which he knows to be defective and dangerous is not relieved from liability because of the fact that the lines or appliances are owned by someone else." (Syl. ¶ 4.)

In this connection it was said in 12 R. C. L. 909:

"But if the company knows at the time it turns on the gas, or after turning on the gas becomes aware, that there are defects in the pipes, it then becomes its duty to make a proper inspection to ascertain the safety of the pipes before it furnishes, or continues to furnish, gas through them."

In 28 C. J. 594 and 595 this same matter is treated, and among other things, on page 594 it is said: "It is immaterial in such case that the pipe where the leak occurred was owned by the consumer." See, also, in the same connection, the general rule and the application of it to service pipes, in 25 A. L. R. 262 and 90 A. L. R. 1082.

All these decisions have been on the second proposition of the three above noted, that is, where the customer owns the service pipe. The third one is the liability of the company to a third party who does not own the service pipe and does not get any gas through it. This matter has been fully and completely settled since the decision on the subject in *Swayzee v. City of Augusta,* 113 Kan. 658, 216 Pac. 265, where it was held:

"A city, which was producing and distributing gas for its patrons within the city, received an application to supply gas for a certain residence and sent

its representative to inspect the meter and the connections on the premises. There was a buried cut-off at the curb where gas passed from the main to the service pipe which was out of order and also a cut-off near the meter between the house of the applicant and that of the plaintiff, who had not applied for, and did not desire to use gas. Upon inspecting the meter and the connections the agent of the city discovered that the pipe leading to the applicant's house in front of the meter was connected with a pipe which led to plaintiff's house, and found that it was open and when the gas was turned on for the house of the applicant it would pass unobstructed into the house of plaintiff. The applicant had not made connections with her stoves, and the agent for the city informed her that the appliances were all right and that when the connections were made she might turn on the gas. Shortly afterwards the connections were made in the house of the applicant, and the plumber employed by her turned on the gas as the agent of the city had instructed. It passed into the house of plaintiff and later, when his wife came home and struck a match in order to light an oil lamp, an explosion occurred which killed her and caused other injuries. The gas was forced up to the exposed cut-off on the premises and was stored in the service pipe, and the permission given by the city to the applicant to turn on the gas was given without notice to plaintiff or his family, when its agent knew that the pipe leading to plaintiff's house was uncapped and out of order and would leak into the house of plaintiff. *Held*, that the city was guilty of negligence and is responsible for the damages resulting to plaintiff from the explosion." (Syl. ¶ 1.)

We conclude that there was substantial and sufficient evidence to support the findings of the jury and that there was no error in the giving or refusing to give instructions.

As to the verdict being excessive where the jury allowed the plaintiff the sum of $9,000 for permanent injuries, we feel very much as the trial judge expressed himself, to the effect that while it is large, yet for a young man only thirty-seven years old with an expectancy of about thirty years, to have a disfigured face and crippled hands which the doctors say will remain practically permanent, and when his business is clerical, with no hope of improvement in ability or certainty of retaining his present clerical position or being able to readily acquire another, we do not feel the shock of conscience which should be experienced when a large verdict is reduced. There can be no question as to his being terribly handicapped throughout life, and under the very unfortunate circumstances we agree with the trial court that the amount is not excessive.

The judgment is affirmed.